[No. AO17793. First Dist., Div. Four. July 15, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
CORNELL ROBINSON, Defendant and Appellant.

[No. AO20899. First Dist., Div. Four. July 15, 1983.]

In re CORNELL ROBINSON on Habeas Corpus.

**[Certified for partial publication.\*]**

---

\*Issues I and II are not certified for publication. See *post,* page 973.

## COUNSEL

Allan A. Samson, under appointment by the Court of Appeal, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Gloria F. DeHart and Ronald D. Smetana, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COOK, J.*—**Cornell Robinson appeals from a judgment sentencing him to confinement in the state prison for two years, following his trial by a jury

*Assigned by the Chairperson of the Judicial Council.

which had found him guilty of possession of a firearm by a person previously convicted of a felony in violation of Penal Code section 12021.[1]

The jury found him not guilty of an aggravated assault in violation of section 245, subdivision (a).

The stated grounds for this timely appeal are:

1. That appellant's Sixth Amendment right to present witnesses in his defense was violated by the prosecuting attorney in a statement to Cheryl Robinson, informing her of her rights under the Fifth Amendment.

2. Error of the trial court in failing to order the prosecuting attorney to grant Cheryl Robinson use immunity.

3. Insufficiency of evidence to sustain the jury finding of his possession of a firearm.

4. An investigative stop by the Richmond Police of Cheryl Robinson was not justified.

5. Even if the stop of Cheryl Robinson were deemed justified, the length of her detention was unreasonable, and weapons seized from her should not have been received in evidence.

6. Appellant's attorney failed to inform him of his right to submit a statement in mitigation to the court pursuant to section 1170, subdivision (b).

7. The imposition of a mid-term sentence of two years constitutes onerous punishment for the section 12021 violation.

### The Petition for Writ of Habeas Corpus

Appellant has also filed his petition for writ of habeas corpus which has been ordered considered on its merits with his appeal. The petition is based on the following allegations:

1. That petitioner is illegally restrained because he was deprived of the effective assistance of counsel, in that:

(a) His counsel failed to move the court, at the trial, to suppress from evidence two revolvers, pursuant to section 1538.5.

---

[1]Unless otherwise noted, all statutory references are to the Penal Code.

(b) His counsel failed to inform him that he had a right to submit a statement in mitigation to dispute facts in the probation officer's report and to present other facts.

### The Factual Background

The events of the evening of August 24, 1981, in the City of Richmond, as testified by witnesses at the trial, are summarized as follows:

Sandra Smallwood testified that she was driving a station wagon in the vicinity of Ninth and Ripley Streets in the City of Richmond at about 9 p.m., when she saw a Buick in front of her. This vehicle started to turn to the left at the intersection and then suddenly changed direction and turned to the right. She was driving slowly preparing to stop at the intersection, but following the sudden change in direction of the Buick she "bumped bumpers" with it.

As she was getting out of her station wagon to talk to the driver of the Buick, she saw that he was approaching her. She identified this person as Cornell Robinson (appellant). He accused her of "hitting him on purpose" and he "pulled out a gun on me and told me not to move."

Smallwood recounted a series of bodily attacks on her person committed by two women while appellant was standing there, watching and still holding the gun in his hand. She managed to evade her attackers and ran to a nearby house. Seeing the flashing lights of a police car, she returned to the scene. She recognized appellant and the two women attackers at that time. These were the only ones present, among several others, whom she was able to identify.

Following her return, Smallwood saw a police officer take a purse and a clutch bag from the possession of one of the women. She saw him remove two weapons from her purse and lay them on the "top" of the Buick. She talked with the two police officers who had arrived at the scene, identified appellant to them as the person who had pointed the gun at her, and described the gun to them which she also identified at the trial as looking "like the gun exactly." It was a .38 caliber revolver.

Smallwood knew that there had been several people in the Buick at the time of the collision, but only recognized appellant, with whom she had conversed. She had never seen any of them before that night. She did see the two females who attacked her get out of the Buick after appellant called to them. Cheryl Robinson was identified to her at the preliminary hearing as the name of one of her attackers.

Richmond Police Officer Rodney Smith testified that he had responded to a radio dispatch concerning an auto accident at Ninth and Ripley Streets. He arrived there about 9 p.m. and observed a Buick in the middle of the intersection, a Ford station wagon near the south curb line and several people in the vicinity.

Smith's first contact was with appellant and Cheryl Robinson. As soon as she saw him, Cheryl hurried back to the Buick where a door was open. She bent over inside it, appeared to be making some motions with her arms, and then started to walk rapidly away with a large, brown purse in her hands. Smith stopped her and asked her what was going on. Appellant then stepped closer and told Smith that Cheryl wasn't involved; that "that bitch hit my car." Appellant pointed down the street to Smallwood who was then running toward the patrol car.

Smith then told Cheryl to have a seat in the Buick until he "found out what was going on." He then went over and talked with Smallwood for "a couple of minutes," had her sit in the car and called an ambulance. He then began a conversation with appellant.

Appellant told Smith that he was driving the Buick, which belonged to his brother, and that Smallwood had run into it. Shortly after this conversation Officer Smith returned to the Buick to talk with Cheryl. As she stepped out of the vehicle she was carrying a large brown purse and also a small clutch type purse. She set the large purse on the hood of the Buick.

As soon as Cheryl had set the purse on the hood, it "flopped open" and Smith could see the butt of a handgun. Smith then arrested Cheryl and handcuffed her. When he took the clutch purse from her, he felt "a hard object in it," which seemed to him to be a weapon. It proved, on examination, to be a loaded .32 caliber revolver.

Smith also placed appellant and his brother, Herman Robinson, who was the registered owner of the vehicle, under arrest. Four .38 caliber bullets were found in appellant's pocket. Appellant was arrested because "the .32 caliber weapon was a stolen weapon approximately two weeks prior to this, and Mr. Robinson [appellant] indicated to me he was the driver of the vehicle."

Appellant testified that his brother, Herman, was driving the Buick at the time of the accident. The other passengers in the vehicle were appellant's wife, Regina, Herman's estranged wife, Cheryl, Otis Gallon and another man. Appellant had noticed that Cheryl was carrying a gun in her purse. When Smallwood rear-ended their vehicle, Herman walked back to Small-

wood's car and began to argue with her. However, no blows were exchanged or weapons displayed. During the argument, Jo Ann Williams, who resided with Herman's daughter, emerged from her nearby house and attacked Smallwood. Smallwood attempted to strike Williams with a sledge hammer. At this point, appellant intervened, grabbed the sledge hammer, and threw it into the yard of Williams' home. Appellant and his brother broke up the fight between Williams and Smallwood. Smallwood fled down the street but returned when a police car arrived.

Appellant further testified that Herman had previously told him that he did not have his driver's license and was facing an outstanding traffic warrant. At Herman's request, he had told the officer that he, rather than Herman, had been driving at the time of the accident. Appellant testified that he never owned or even touched either of the weapons seized from Cheryl. The bullets found in his pocket had been given to him by his father, Harry Robinson, earlier in the day. The father testified that he had discovered the bullets in his own garage and asked appellant to take and dispose of them so they would not be found by his grandchildren.

Appellant's wife, Regina, and his brother, Herman, each testified that Herman had been driving at the time of the collision and had been the one who argued with Smallwood. Neither Herman nor Cornell was carrying a gun. These witnesses also stated that Jo Ann Williams emerged from her house at the time of the argument and attacked Smallwood. Regina described Williams as Herman's girl friend and also testified that Williams placed the purse in the Buick, and then returned to her own house after Smallwood fled from her. Regina stated that she had accompanied Williams inside the house, just before the police arrived. Williams did not testify at the trial.

### Discussion

We will consider the issues raised on appeal and in the petition in this discussion since they involve, in part, a common origin in the events and proceedings.

### I-II*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### III

Was appellant's right to present witnesses in his defense violated to his prejudice by:

---

*See *post,* page 973.

A. The prosecutor's statements to Cheryl Robinson in the course of informing her of her constitutional rights against self-incrimination?

B. The failure of the trial court to order the district attorney to grant Cheryl Robinson use immunity?

### A.

We consider first the purpose for which Cheryl was to have been called as a defense witness.

Defense counsel made the following offer of proof concerning the testimony she anticipated Cheryl Robinson would have given had she taken the stand:

"I am informed and believe that if Miss Robinson were to testify, she would testify that Herman Robinson, rather than Cornell Robinson, was the driver of the vehicle involved in the accident at 9th and Ripley on the evening in question and that at the time of the accident Miss Cheryl Robinson observed a confrontation between Herman Robinson, her then husband, and the alleged victim of this offense, Miss Smallwood.

"I believe that she would further testify that at no time during the course of this confrontation did she see any male person present in possession of any firearm.

"Additionally, I am informed and believe and would thereon allege that if Miss Robinson were granted immunity and allowed to testify, that she would further testify that the incident involving the alleged assaultive conduct between the two females, Mrs. Smallwood and Jo Ann Williams, involved only those persons and was not participated, aided or abetted or assisted by any other person present on the scene.

"I further believe that if Miss Robinson were to testify in conjunction with this matter, that [she] would state facts sufficient to indicate that the defendant, Cornell Robinson, is in no way guilty of the offenses alleged against him.

"*Although it would appear that, in part, her testimony would be corroborative of other persons,* that Miss Robinson is known to be a percipient witness to all the events that occurred on the evening in question, that she personally observed those events, and it is my belief that she has current knowledge and ability to recollect and to answer questions with regard to

those events in the way that would be beneficial to the defendant, Cornell Robinson.'' (Italics added.)

This offer was made following the proceedings relative to the admonition given by defense and prosecution counsel to Cheryl Robinson as a prospective witness, in view of her participation in and presence at the subject events of August 24, 1981, and her having been named as a codefendant with appellant in preliminary proceedings and having been held to answer with him, although not named in the information filed in this case.

Since appellant was acquitted of the assault charge, the materiality, in this appeal, of Cheryl's expected testimony is limited to only two factual issues: (1) the identity of the man who first encountered Smallwood and (2) whether or not he was carrying a firearm.

On these two points, the following testimony had been received:

(1) Smallwood's identification of Cornell Robinson as the man who accosted her and her statement that he was carrying a firearm at that time.

(2) Herman Robinson, appellant's brother and Cheryl's husband, had testified that he had been driving the Buick at the time it was hit by the Smallwood station wagon; and it was he who went back to talk to the other driver; that he did not have any weapon that evening and did not see his brother, Cornell, in possession of any weapon.

(3) Regina Robinson, appellant's wife, also testified that she had never seen a weapon in Cornell's hands during the evening of August 24, 1981, or in the hands of any other person except Cheryl.

(4) Defendant had given similar testimony.

■ As defense counsel had stated, the testimony sought from Cheryl would have been cumulative. Since the jury had apparently disbelieved the testimony of Herman and Regina, we do not believe that the identical testimony from Cheryl would have moved the jury to conclude that appellant was not in possession of the weapon as Smallwood had testified.

We now summarize the proceedings preceding Cheryl's decision to decline to testify. The defense had called her as a witness and, out of the presence of the jury, defense counsel had examined her concerning her understanding and willingness to waive her privilege against self-incrimination, using such terms as ''could'' and ''might'' in explaining future possibility of her testimony being used against her.

The prosecuting attorney, apparently fearful that such admonishment was too indefinite, began her cross-examination of Cheryl in the following manner:

"Q. I'd like to change some of the wording of the questions that were asked you.

"As a representative of the District Attorney's Office, I need to advise you that charges not only can be charged against you, *but they will be filed, should you take the stand.*

"Do you understand that?

"A. Yes.

"Q. And if you are convicted and because of your record, your past record can be used and will be used against you for any punishment.

"A. Yes. I understand that too." (Italics added.)

Cheryl repeated that she was still willing to testify but after the court suggested that she seek counsel from the public defender, and she had done so, she changed her mind and declined to give further testimony.

In a similar factual context, such an "admonition" was held to be prejudicial to a defendant in *United States* v. *Smith* (D.C.Cir. 1973) 478 F.2d 976, 979, where the court stated: "We think the prosecutor's warning was plainly a threat that resulted in depriving the defendants of [a witness's] testimony. . . . Even if the prosecutor's motives were impeccable, however, the implication of what he said was calculated to transform [the witness] from a willing witness to one who would refuse to testify, and that in fact was the result."

We now confront the more difficult question of whether the loss of Cheryl's testimony was prejudicial to the appellant. Several federal circuits, relying upon the absence of any discussion of prejudice in the majority opinion in *Webb* v. *Texas* (1972) 409 U.S. 95 [34 L.Ed.2d 330, 93 S.Ct. 351], have held that intimidation of a potential defense witness is reversible per se. (*United States* v. *Hammond* (5th Cir. 1979) 598 F.2d 1008, 1013; *United States* v. *Morrison* (3d Cir. 1976) 535 F.2d 223, 228; *United States* v. *Thomas* (6th Cir. 1973) 488 F.2d 334, 336; *Bray* v. *Peyton* (4th Cir. 1970) 429 F.2d 500, 501.) In other instances, courts have found it unnecessary to consider this question as the misconduct was prejudicial under traditional harmless error analysis. (*United States* v. *MacCloskey* (4th Cir. 1982) 682

F.2d 468, 479.) More recently, however, the District of Columbia Circuit has declined to follow the harmful per se approach in light of intervening authority of the Supreme Court. (*United States* v. *Blackwell* (D.C.Cir. 1982) 694 F.2d 1325, 1341-1343.)

*United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858 [73 L.Ed.2d 1193, 102 S.Ct. 3440], holds that where government conduct deprives a defendant of the testimony of a potential witness, thereby implicating an interest protected by the Fifth and Sixth Amendments, an appellate court should only reverse the conviction upon a showing of actual prejudice to the defendant. There, the defendant was charged with transportation of an illegal alien, in violation of immigration laws; two other persons, also illegal aliens, who were passengers in the car with the accused and the transported alien, were deported. The court, reviewing past decisions arising under both the Fifth and Sixth Amendments, concluded that a defendant may obtain reversal on the ground the government has suppressed or otherwise deprived him of relevant testimony only " 'where the evidence is favorable to the accused and is material either to guilt or to punishment.' " (*Id.,* at p. 868 [73 L.Ed.2d at p. 1203, 102 S.Ct. at p. 3447], quoting *Moore* v. *Illinois* (1972) 408 U.S. 786, 794.) The court placed considerable stress upon the requirement of a showing of materiality: "Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been *material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses."* (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 873 [73 L.Ed.2d at p. 1206, 102 S.Ct. at pp. 3449-3450]; italics added.)

*Valenzuela-Bernal,* noting the important policies underlying the government's authority to deport persons illegally within its borders, concluded that, since the defendant had made no showing of the materiality of the witness' anticipated testimony and thus no showing of prejudice, no constitutional violation had occurred. Here, we have already determined that the prosecutor's statements constituted improper intimidation of a defense witness, regardless of the propriety of the prosecutor's motives. Nonetheless, *Valenzuela-Bernal* distills its requirement of a showing of prejudice from cases involving both lawful and unlawful government conduct. Accordingly, we conclude *Valenzuela-Bernal* instructs that reversal is appropriate in this case only if it appears that the failure of Cheryl Robinson to testify may have affected the outcome of appellant's trial. (*United States* v. *Blackwell, supra,* 694 F.2d 1325, 1341-1343.)

Since we have concluded that the identical testimony, on the subject of the possession of the .38 caliber revolver by appellant during the evening

of August 24, 1981, by another member of his family, would not have resulted in a different verdict, we further conclude that the conduct of the prosecutor, which encouraged Cheryl Robinson to assert her Fifth Amendment privilege, was harmless beyond a reasonable doubt and that appellant was therefore not prejudiced by the loss of her testimony.

## B.

Having so concluded, we need not consider the failure of the trial court to order the district attorney to grant Cheryl Robinson use immunity.[3]

### IV. *The Sentence*

Is two years' imprisonment the middle term
for violation of Penal Code section 12021?

■ The court sentenced appellant to two years' imprisonment for violation of Penal Code section 12021; in its judgment it described this sentence as the middle term for the offense. Appellant claims, instead, that confinement in county jail is the mid-term for violation of section 12021. There is no showing in the record that appellant raised this argument in the trial court. (See *People* v. *Paul* (1978) 78 Cal.App.3d 32, 49 [134 Cal.Rptr. 431].) Even ignoring this bar to review, his construction of the pertinent statutes is untenable.

Penal Code section 12021, subdivision (a), provides that possession of a concealable firearm by a felon "shall be punishable by imprisonment in the state prison, or in a county jail not exceeding one year or by a fine not exceeding five hundred dollars ($500), or by both." As the offense is punishable with a prison sentence, it is a felony although the statute allows discretion to the prosecutor to charge it or the court to sentence it as a misdemeanor. (See § 17.) As the term of imprisonment is not prescribed, section 18 governs the range of felony sentencing choices: "Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a felony, or to be punishable by imprisonment in a state prison, is punishable by imprisonment in any of the state prisons for 16 months, or two or three years; provided, however, every offense which is prescribed by any law of the state to be a felony punishable by imprisonment in any of the state prisons or by a fine, but without an alternate sentence to the county jail, may be punishable by imprisonment in the county jail not exceeding one year or by a fine, or by both."

---

[3]We note that this issue has been ably analyzed in *People* v. *DeFreitas* (1983) 140 Cal.App.3d 835 [189 Cal.Rptr. 814].

Appellant does not deny that section 18 is applicable to violations of section 12021. He appears to argue that since section 12021 may be prosecuted or sentenced as a misdemeanor punishable by jail or fine, the court must elect to punish it as a misdemeanor unless it finds aggravating circumstances. No authority supports this position. Although no decision has considered this precise argument, courts have referred to two years and three years as the middle and upper terms respectively for violations of section 12021. (See *People* v. *Gaines* (1980) 112 Cal.App.3d 508, 511 [169 Cal.Rptr. 381]; *People* v. *Pinon* (1979) 96 Cal.App.3d 904, 907 [158 Cal.Rptr. 425]; *People* v. *Betterton* (1979) 93 Cal.App.3d 406, 409 [155 Cal.Rptr. 537].) The offense was charged and tried as a felony. The trial court in its discretion did not reduce it to a misdemeanor. It therefore remained a felony for sentencing purposes and section 18 was applicable. The sentence of two years' imprisonment received by appellant is the "middle" of the three terms provided in that statute. " 'The question of sentencing is a matter within the exclusive jurisdiction of the trial court so long as it imposes a penalty within limits authorized by statute. [Citation.]' [Citation.] The penalty here imposed satisfied statutory sentencing requirements. (Pen. Code, § 18.)" (*People* v. *Rousseau* (1982) 129 Cal.App.3d 526, 537 [179 Cal.Rptr. 892].) No error is shown.

Portions of this opinion, designated as issues I and II, are not certified for publication. (Cal. Rules of Court, rules 976 and 976.1.)

Having found no prejudicial errors cognizable in either the appeal or the petition:

The judgment is affirmed and the petition for writ of habeas corpus is denied.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied August 3, 1983.